# EXHIBIT 9
# 3M'S ANSWER TO FIRST AMENDED COMPLAINT

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| MOLDEX-METRIC, INC., <br><br> Plaintiff, <br><br> vs. <br><br> 3M COMPANY and 3M INNOVATIVE PROPERTIES COMPANY, <br><br> Defendants. | Civil No. 14-1821 (JNE/FLN) |

## ANSWER TO FIRST AMENDED COMPLAINT

Defendants 3M Company and 3M Innovative Properties Company (together, "3M") hereby answer and respond to the First Amended Complaint for Monopolization and Attempted Monopolization, Unfair Competition, and Malicious Prosecution (the "First Amended Complaint") filed by Moldex Metric, Inc. ("Moldex").

## NATURE OF THE ACTION

The allegations in this section of the First Amended Complaint contain Moldex's characterizations of its claims and legal conclusions, to which no response is required. To the extent that a response is required, 3M denies the allegations in this section, except it admits that: it filed a patent infringement lawsuit against Moldex in this Court on March 8, 2012, in which 3M alleged that Moldex's BattlePlugs® earplugs and several of its M-Series earmuffs infringe two U.S. patents (U.S. Patent No. 6,070,693 (the "'693 Patent") and U.S. Patent No. 7,036,157 (the "'157 Patent")), respectively (the "Underlying Lawsuit"); and that the parties engaged in discovery and briefed dispositive

motions in the Underlying Lawsuit. 3M states that its conduct in pursuing its infringement claims against Moldex was proper and was not objectively baseless, or subjectively motivated to interfere with Moldex's business, and that 3M voluntarily dismissed its allegations in the Underlying Lawsuit after discovery, including because discovery revealed that its potential recoverable damages did not justify the expense and burden of continued litigation. 3M specifically denies that it engaged in monopolistic, anticompetitive, or wrongful conduct.

3M further admits that it markets a non-linear, dual mode earplug under the "Combat Arms" trademark, with a "0" Noise Reduction Rating ("NRR"), which was calculated in accordance with U.S. Environmental Protection Agency ("EPA") regulations. The EPA regulations expressly require that the NRR be calculated following a specific formula and that it be included on the label of those products.

1. 3M admits upon information and belief the allegations in paragraph 1.

2. 3M admits the allegations in the first and second sentences of paragraph 2. The third sentence of paragraph 2 purports to state a legal conclusion that does not require a response. To the extent a response to the third sentence of paragraph 2 is required, 3M denies the allegations.

3. 3M admits the allegations in paragraph 3, except states that 3M Innovative Properties Company owns the 3M group's intellectual property.

4. 3M admits that the First Amended Complaint purports to assert claims under certain antitrust laws of the United States, including Title 15 of the United States Code.

5.	3M admits the allegations in paragraph 5.

6.	3M admits the allegations in paragraph 6.

7.	3M admits the allegations in paragraph 7.

8.	3M denies the allegations in paragraph 8, except admits Moldex alleges that this action involves "non-linear" or "selective attenuation" earplugs, some of which are purchased and used by the U.S. military and that such earplugs can be worn by soldiers in the field so that they are protected from the intense impulse sounds of battlefield explosions while still being able to communicate with their colleagues. 3M further admits that non-linear earplugs are designed to block or attenuate sounds of different amplitude and frequency to differing degrees, such that the wearer is protected from intense impulse sounds while still being able to hear sounds of different amplitude or frequency.

9.	3M denies the allegations in paragraph 9, except admits that the United States military is the largest purchaser of Combat Arms earplugs.

10.	3M denies the allegations in paragraph 10, except admits that this action involves a type of hearing protector known as an earmuff.

11.	3M denies the allegations in paragraph 11, except admits that hearing protectors, including earplugs and earmuffs, are sold with a listed NRR, which is calculated according to a formula provided for by certain federal regulations. 3M further admits that it has conducted NRR testing at a laboratory operated by 3M personnel that has been approved for such testing.

12.	3M denies the allegations in paragraph 12.

13. 3M denies the allegations in paragraph 13.

14. The allegations in paragraph 14 purport to state legal conclusions that do not require a response. To the extent that a response is required, 3M denies the allegations in paragraph 14, except admits that it has manufactured and sold five versions of its Combat Arms non-linear earplug, each of which uses a sound channel with constrictions and openings to produce its non-linear sound attenuation effect. 3M further admits that its Combat Arms earplugs allow the user to set the earplug for a second mode of operation.

15. 3M denies that Moldex's BattlePlugs® provided the first actual competition to 3M's Combat Arms earplug. 3M lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 15.

16. 3M denies the allegations in paragraph 16, except admits that it filed a claim against Moldex for infringement of the '693 Patent in the Underlying Lawsuit.

17. The allegations in paragraph 17 purport to state legal conclusions that do not require a response. To the extent a response is required, 3M denies the allegations in paragraph 17.

18. The allegations in paragraph 18 purport to state legal conclusions that do not require a response. To the extent a response is required, 3M denies the allegations in paragraph 18, except admits that the quotation in paragraph 18 is contained in the summary of the invention in the '693 Patent.

19.     3M denies the allegations in paragraph 19, except admits that it currently offers two versions of its Combat Arms earplug, and that one version operates by blocking the non-linear sound channel with a plug or block operated by a toggle device.

20.     The allegations in paragraph 20 purport to state legal conclusions that do not require a response. To the extent a response is required, 3M denies the allegations in paragraph 20.

21.     3M denies the allegations in paragraph 21, except states that it was contacted by Moldex following 3M's filing of the Underlying Lawsuit regarding 3M's allegations based on the '693 Patent, and that 3M continued to pursue the Underlying Lawsuit.

22.     3M lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 22 regarding the introduction of the M-series earmuffs. The remaining allegations in paragraph 22 purport to state legal conclusions that do not require a response. To the extent a response is required, 3M denies the remaining allegations in paragraph 22, except admits that, in the Underlying Lawsuit, 3M also brought a claim against Moldex alleging that several of Moldex's M-series earmuffs infringe the '157 Patent.

23.     3M denies the allegations in paragraph 23, except states that it was contacted by Moldex following the filing of the Underlying Lawsuit regarding 3M's allegations based on the '157 Patent and that 3M continued to pursue the Underlying Lawsuit.

24. The allegations in paragraph 24 purport to state legal conclusions that do not require a response. To the extent that a response is required, 3M denies the allegations in paragraph 24, except admits that Moldex filed a motion for summary judgment of non-infringement of the '693 Patent on January 18, 2013 and that a hearing was set for March 21, 2013. 3M further admits that it offered Moldex a covenant not to sue, and subsequently filed a motion to dismiss its claims regarding the '693 Patent with prejudice and to dismiss Moldex's counterclaims of non-infringement and invalidity of the '693 Patent without prejudice. 3M also admits that, on June 19, 2013, the Court dismissed 3M's claims with prejudice and dismissed Moldex's counterclaims without prejudice.

25. The allegations in paragraph 25 purport to state legal conclusions that do not require a response. To the extent that a response is required, 3M denies the allegations in paragraph 25, except admits that 3M pursued its allegations based on the '157 Patent after 3M offered Moldex a covenant not to sue regarding the '693 Patent. 3M further admits that it sought discovery from Moldex regarding the '157 Patent, including depositions from the eight named Moldex employees.

26. The allegations in paragraph 26 purport to state legal conclusions that do not require a response. To the extent that a response is required, 3M denies the allegations in paragraph 26, except admits that it offered Moldex a covenant not to sue regarding the '157 Patent in May 2013. 3M further admits that, on June 19, 2013, the Court dismissed 3M's claims regarding the '157 Patent with prejudice and dismissed Moldex's counterclaims without prejudice.

27.     The allegations in paragraph 27 purport to state legal conclusions that do not require a response.  To the extent that a response is required, 3M denies the allegations in paragraph 27, except states that it corresponded with Moldex regarding dismissal of its patent claims, and refers to the parties' communications for their contents.

28.     3M denies the allegations in paragraph 28.

29.     The allegations in paragraph 29 purport to state legal conclusions that do not require a response.  To the extent that a response is required, 3M denies the allegations in paragraph 29, except admits that it participates in the Javits-Wagner-O'Day ("JWOD") federal Ability One Program.  3M further admits that it sells Combat Arms products with an NRR rating of "0."  3M lacks sufficient knowledge or information to form a belief as to the truth of the allegation in the last sentence of paragraph 29.

30.     3M denies the allegations in paragraph 30, except admits that it acquired Aearo Technologies, Inc. ("Aearo") and the Combat Arms brand in 2008.

31.     3M admits that it reports a 0 NRR for the open end and 22 NRR for the closed end for the Combat Arms earplug, version two ("CAEv.2").  3M otherwise denies the allegations in paragraph 31.

32.     The allegations in paragraph 32 purport to state legal conclusions that do not require a response.

33.     3M denies the allegations in paragraph 33, except as follows.  3M admits that, in January 2000, the EARCAL laboratory (then operated by Aearo) tested both ends of the CAEv.2, which has two insertable ends.  3M admits that some of the test subjects were Aearo employees.  3M admits that Aearo performed tests without an earplug

- 7 -

inserted and with the CAEv.2 inserted.  3M admits that Aearo monitored the results of these tests.  Based on these test results, 3M reported an NRR value of a "0" on its packaging for CAEv.2.

34.     3M denies the allegations in paragraph 34, except as follows.  3M admits that, Aearo conducted tests on the closed end of CAEv.2 in January 2000, and prepared a report relating to the testing.  The contents of the report speak for themselves.

35.     3M denies the allegations in paragraph 35 except as follows.  3M admits that, in 2000, two Aearo employees conducted a new test on the closed end of CAEv.2.  During this test, the yellow flanges on the open end of the earplug were folded back.  Based on these test results, it reported an NRR value of "22" on its packaging.

36.     3M denies the allegations in paragraph 36 except as follows.  3M admits that Aearo did not conduct tests of the open end of CAEv.2 in which it folded back the green flanges.

37.     3M denies the allegations in paragraph 37.

38.     3M denies the allegations in paragraph 38.

39.     Responding to paragraph 39, 3M repeats its responses to paragraphs 1 through 38 and paragraphs 43 through 51 of the First Amended Complaint, incorporating them by reference as if set forth in full.

40.     3M denies the allegations in paragraph 40.

41.     3M denies the allegations in paragraph 41.

42.     3M denies the allegations in paragraph 42.

43. Responding to paragraph 43, 3M repeats its responses to paragraphs 1 through 42 of the First Amended Complaint, incorporating them by reference as if set forth in full.

44. 3M denies the allegations in paragraph 44.

45. 3M denies the allegations in paragraph 45.

46. 3M denies the allegations in paragraph 46, except as follows.  3M admits that it voluntarily dismissed its claims in the Underlying Lawsuit.

47. Responding to paragraph 47, 3M repeats its responses to paragraphs 1 through 46 of the First Amended Complaint, incorporating them by reference as if set forth in full.

48. 3M denies the allegations in paragraph 48.

49. 3M denies the allegations in paragraph 49.

50. 3M denies the allegations in paragraph 50.

51. 3M denies the allegations in paragraph 51.

52. 3M denies all allegations of the First Amended Complaint to the extent not expressly admitted.

53. 3M denies that Moldex is entitled to the relief sought in its prayer for relief paragraphs.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

54.     The First Amended Complaint fails to state a claim upon which relief against 3M may be granted.

### Second Affirmative Defense

55.     Moldex's claims are barred insofar as they challenge the exercise of rights protected by the First Amendment of the United States Constitution and the *Noerr-Pennington* doctrine.

### Third Affirmative Defense

56.     There has been no antitrust injury and no harm to competition caused by 3M's conduct as alleged in the First Amended Complaint.

### Fourth Affirmative Defense

57.     Moldex has failed to mitigate its damages, if any.

### Fifth Affirmative Defense

58.     Moldex's claim for false advertising is time-barred.

### Sixth Affirmative Defense

59.     Moldex's amended claim for unfair competition is barred in whole or in part by the doctrine of unclean hands.

60.     Aearo (which was acquired by 3M in 2008) developed one of the first selective nonlinear attenuating earplugs, known as the "Combat Arms Earplug Version 1" in the late 1990s.  In the late 1990s, various United States military personnel, including military audiologist Douglas Ohlin, began discussions with Aearo to develop a new

Combat Arms earplug that would have two insertable ends, with each offering a differing level of attenuation. The military was interested in this type of earplug because, among other reasons, it would eliminate the need for soldiers to carry two sets of earplugs to get two different levels of protection from noise. Aearo and the military worked together to develop a prototype product, which later became known as "version two" or "generation two" ("CAEv.2")—and which Moldex's Amended Complaint refers to as the "dual-ended Combat Arms."

61.     The military, represented by Doug Ohlin, rejected the first prototype CAEv.2 because a pair of them could not fit vertically into the specific carrying case that was designed by Mr. Ohlin and issued to all noise-exposed Army personnel. Mr. Ohlin, speaking on behalf of the Army, asked Aearo to redesign the product to shorten the stem so that a pair would fit more conveniently into the carrying case, which Aearo did.

62.     In early 2000, Aearo performed tests on the "open" and "closed" ends of CAEv.2. The military was aware of these tests, the conditions under which they were performed, and the results obtained. Aearo and Mr. Ohlin, speaking on behalf of the military, agreed that testing on the "closed" end should be performed by folding back the yellow flanges on the opposing end.

63.     Mr. Ohlin was fully aware of the methods used to test both the open and closed ends of CAEv.2, and the military proceeded to order the product for use by the military for over ten years.

64.     The military has instructed military personnel regarding how to fit CAEv.2.

65. Despite these facts, Moldex amended its Complaint to add new allegations that 3M's NRR testing of CAEv.2 violated the Noise Control Act of 1972, 42 U.S.C. § 4901 et seq. ("Act"). Moldex added this claim even though Moldex was aware that Moldex had presented inaccurate information to the government regarding earplugs. Moreover, Moldex added this claim even though Moldex was aware that NRR data reported on Moldex's Internet brochures and packaging for its M-Series and Special Ops earmuffs had not complied with the Act. Moldex's conduct regarding earplugs and earmuffs constitutes unclean hands.

66. The Act directs the Environmental Protection Agency ("EPA") to publish regulations governing noise-producing and noise-reducing products. *See* 40 C.F.R. § 211 *et seq.* ("Regulations"). The Regulations require certain noise-reducing products, including earmuffs, to display a label that includes the product's NRR along with "supporting information" used to arrive at that NRR. *See id.* § 211.204–4. Every NRR label must include "[t]he mean attenuation and standard deviation values obtained for each test frequency according to § 211.206, and the NRR calculated from those values." *Id.* § 211.204–4(a). In addition, "[t]he Noise Reduction Rating for the label must be calculated using the Labeled Values of mean attenuation that will be included in the supporting information required by § 211.204–4." *Id.* § 211.211(b).

67. The mean attenuation and standard deviation values listed on certain Internet brochures for Moldex's M1 and M1 Special Ops earmuffs did not support the claimed NRR of 29. When the values listed on those labels are used to calculate an NRR pursuant to the formula specified in § 211.207, the result is an NRR of 26 at most. By

overstating the NRR of these earmuffs, Moldex violated § 211.204–1, which provides that "[t]he value stated on the label must be no greater than the NRR value determined by using the computation method of 211.207 of this subpart." Moldex further violated § 211.211(b) which requires the labeled NRR to be "calculated using the Labeled Values of mean attenuation." The front pages of certain brochures for Moldex's M1 and M1 Special Ops earmuffs also featured a graphic touting an NRR of 33—an even more egregious overstatement of the protection actually provided.

68.     Certain Moldex Internet brochures further violated the Regulations by reporting identical mean attenuation and standard deviation data for the M1 and Special Ops M1, and the M2 and Special Ops M2, respectively. On information and belief, these products are made from different materials, presumably resulting in different sound attenuation characteristics. Moldex violated § 211.211(b) by failing to separately test and report data for these earmuffs, which requires a manufacturer's labels "take into account . . . product variability."

69.     It appears that at some point after the deposition of a Moldex employee on November 30, 2015, Moldex replaced the incorrect and misleading brochures with ones reporting entirely new sets of NRR data for its M1 and M1 Special Ops earmuff. These new replacement brochures indicated a revision date of "01/15," which was inaccurate on its face.

70.     Moldex listed the erroneous NRR data featured in the incorrect and misleading brochures elsewhere on its website. Indeed, Moldex affirmatively directed

- 13 -

consumers who seek "Attenuation Data" for the M-Series and Special Ops earmuffs to this misleading and inaccurate NRR data.

71.     The mean attenuation and standard deviation values listed on the packaging of certain Moldex M1 earmuffs did not support the claimed NRR of 29. The overstatement of the NRR for these earmuffs violated § 211.204–1, which provides that "[t]he value stated on the label must be no greater than the NRR value determined by using the computation method of 211.207 of this subpart." It also violated § 211.211(b) which requires the labeled NRR to be "calculated using the Labeled Values of mean attenuation."

72.     The mean attenuation and standard deviation values listed on the packaging of certain Moldex M2 earmuffs did not support the claimed NRRs of 26 (over-the-head) or 24 (behind-the-head and under-the-chin). The overstatement of the NRR for these earmuffs violated § 211.204–1, which provides that "[t]he value stated on the label must be no greater than the NRR value determined by using the computation method of 211.207 of this subpart." It also violated § 211.211(b) which requires the labeled NRR to be "calculated using the Labeled Values of mean attenuation."

73.     Despite the requirements for proper labeling detailed by the Regulations and mandated by the Act, Moldex gave potential consumers information that did not reflect the actual NRR and its underlying associated data.

74.     Moldex was on notice of its violations of the Act and the inaccurate information it provided to the government regarding earplugs before it filed its Amended

Complaint, and its conduct warrants the application of the doctrine of unclean hands to Moldex's amended unfair competition claim.

By asserting an affirmative defense herein, 3M does not assume the burden of proof or persuasion not otherwise required by applicable law.

WHEREFORE, 3M respectfully requests that the Court enter judgment dismissing the First Amended Complaint in its entirety with prejudice and awarding 3M the costs, disbursements and attorneys' fees it incurs in defending against the First Amended Complaint, together with such other and further relief to 3M as the Court determines to be just and proper under the circumstances.

| | |
|---|---|
| Dated: February 5, 2016 | FAEGRE BAKER DANIELS LLP |
| | *s/ David J.F. Gross* |
| | David J.F. Gross (#208772)<br>Calvin L. Litsey (#153746)<br>Chad Drown (#319053)<br>Eileen M. Hunter (#0336336)<br>2200 Wells Fargo Center<br>90 South Seventh Street<br>Minneapolis, Minnesota 55402-3901<br>Telephone: (612) 766-7000<br>Fax: (612) 766-1600<br>david.gross@FaegreBD.com<br>calvin.litsey@FaegreBD.com<br>chad.drown@FaegreBD.com<br>eileen.hunter@FaegreBD.com |
| US.104628774.01 | **Attorneys for Defendants 3M Company and 3M Innovative Properties Company** |